### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

**RICKEY ALLEN JORDAN**         **CIVIL ACTION NO. 11-CV-0723**

**VERSUS**         **JUDGE S. MAURICE HICKS, JR.**

**MARTHA S. GARRISON, ET AL**         **MAGISTRATE JUDGE HORNSBY**

### <u>MEMORANDUM RULING</u>

A civil bench trial was held on Tuesday, February 18, 2014 on the remaining claims in the above captioned matter. This Court's factual findings, legal standards and legal analysis is set forth below.

### Summary of the Facts:

At some point in late 2009 or early 2010, Richard Wood moved in with plaintiff, Rickey Allen Jordan in exchange for Wood's work on Jordan's home, which was built on high piers with storage space underneath. Wood brought his work tools to Jordan's property, where he stored and used them. Jordan afforded Wood the use of his camper/trailer to store some of those tools. Thus, Jordan's camper/trailer housed Wood's tools, but it was Wood's padlock on the camper/trailer.

This arrangement worked well until Wood left for a period of time. It was obvious from the testimony that there was still residual enmity between the two. The record is not clear about the precise reason for the dissolution of the living-working arrangement between these individuals; however, it is clear from the testimony and the inferences therefrom that Wood was entirely justified in seeking the help of Deputies Garrison and Pye in retrieving his personal items on Jordan's home property on May 16, 2010.

On or before May 16, 2010, Jordan stated to Wood that Wood's personal tools were

not on the property and that he was not to come back to the property. Wood had been told by a neighbor of Jordan's that much of his equipment, including his large steel "job box," had been removed from the property by Jordan. (Testimony of Richard Wood). From the testimony it is obvious that their personal and work relationship had soured, and that Wood's property was taken away as retaliation or possibly leverage.

On May 16, 2010 Caddo Parish Sheriff Cpl. Martha Garrison was the training officer for Deputy Michael Pye, who started the field training program two weeks previously. As the officers were driving on Ferry Lake Road in Oil City, Louisiana near Jordan's home, they were waved down by Wood. (Testimony of Garrison and Pye).

Wood told the officers that he had extensive and valuable tools and equipment at Jordan's residence, which Jordan refused to return. Wood also reported that some of his tools and equipment had already been removed from the location by Jordan. Wood also stated that he had received a message from a neighbor of Jordan that Jordan had in fact removed Wood's personal property from the location.  (Testimony of Garrison, Pye, and Wood; CPSO Report of Witness Tyler statement, Exhibit 1; see also interview of witness Tyler at Mobile Video System – hereafter referred to as "MVS" – 11:34:40).

Cpl. Garrison and Deputy Pye drove the short distance to Mr. Jordan's residence, and Mr. Wood followed on foot. Based on Wood's statements, the deputies were investigating possible criminal activity by Jordan, as well as assisting Mr. Wood and avoiding potential escalation.  (Testimony of Cpl. Garrison and Deputy Pye).  The Court viewed the patrol car's dashcam video as part of the bench trial.

Based upon the demeanor and level of detail of the information provided by Wood, he appeared to be sincere in his description of what had occurred and appeared credible to the deputies.  (Testimony of Garrison and Pye).

The patrol unit used by Garrison and Pye is equipped with a mobile video system ("MVS") with a remote audio recording device and in-car audio recording.  Under these circumstances, when a trainee is being utilized, the trainee uses the remote microphone.  Deputy Pye's microphone was activated and a copy of the recording is Joint Exhibit 101.  (Testimony of Garrison and Pye).

Deputy Pye and Cpl. Garrison went to the property of Jordan and questioned Jordan regarding the information provided by Wood.  Jordan made numerous statements that Cpl. Garrison and Deputy Pye later determined were false, including the following (the time referenced is set forth on the MVS recording).

| | | |
|---|---|---|
| 10:54:25 | Plaintiff: | I don't know what he's got left here. |
| 10:54:33 | Garrison: | What happened to the other tools? |
| | Plaintiff: | I don't know.  He said somebody stole some of them, there some of them missing, I don't have any idea. |
| 10:54:38 | Garrison: | Did you take them somewhere? |
| | Plaintiff: | No, sir, I didn't take anything. |
| 10:54:43 | Plaintiff: | No, I didn't take nothing of his stuff anywhere. |
| 10:55:50 | Garrison: | You have some of his tools at your shop? |
| | Plaintiff: | No I don't have anything.   Everything was right here…. |
| 10:57:58 | Pye: | Does he have anything inside the house that of his? |
| | Plaintiff: | No sir, not that I know of. |

3

Pye:            He didn't have a computer or anything?

                Silence.

Pye:            Did he have a computer inside the house?

Plaintiff:      Yes, I have a computer.

Pye:            Is it his?

Plaintiff:      It was his, I don't know what we were going to work out on that or what.

11:06:00   Garrison:       Who paid for that computer?

Plaintiff:      I have no idea….

Garrison:       Do you know if you paid for it or not?

Plaintiff:      I don't know.

10:58:21   Wood:           Big yellow job site box?  It was sitting right there.

Plaintiff:      That's been gone for way before you left, I assumed you took that with you or whatever.  You didn't take that with you to wherever you went?

Wood:           No.

Plaintiff:      Well I don't, I have no idea what stuff was here.  He had a key to all, I didn't have a key to any of it.  That's his air compressor.  I tried to get him to put those doors up because he said people were getting his stuff, so I don't know.  He left here.  I didn't know nothing.  As far as I am concerned, I mean, me and him are through.

10:59:40   Garrison:       When will you be available for us to check your shop?

Plaintiff:      This is his stuff.

Garrison:       But he's got stuff missing.

Plaintiff:      Well I don't know what…All I know is, you see, anybody could have got it.  He told me they were getting it.  I have no idea where it all is.

4

| 11:00:24 | Garrison: | For him to be okay, and say that you don't have any stuff in your shop, then that's what we want to look in for tomorrow. And that's okay with you? |
| | Plaintiff: | Well I mean, I don't have nothing there. |
| 11:13:34 | Garrison: | Are you going to let him get his stuff? |
| | Plaintiff: | What stuff does he have? |

(Testimony of Garrison and Pye; MVS at times stated). The Court notes that these recordings demonstrate plain inconsistencies with Jordan's subsequent statements to the deputies. The Court concludes that these statements by Jordan were outright lies and purposeful evasions.

Despite these statements, it was obvious that there had been extensive equipment there and that other equipment owned by Wood was missing; Jordan finally but reluctantly admitted that some of Wood's personal property had been removed. Specifically, the camper trailer containing Wood's personal property had been moved by Jordan to Vivian (MVS at 11:08:50); and that the computer at the residence had been purchased by Wood (MVS at 11:03:25). Jordan moved the trailer to the property of a third-party, not to Jordan's business in Vivian. This Court infers and concludes from the testimony that Jordan moved the camper trailer in an attempt to hide Wood's property and made it very difficult, if not impossible, for Wood to ever recover his property.

Wood also reported to the deputies that a neighbor, Tyler, had witnessed Jordan leaving with the large yellow job box on the back of his truck while pulling a camper, and that another neighbor, Fontenot, had told Glenn Tennis that he had helped Jordan load the job box onto Jordan's truck. Wood's other statements had been corroborated, so the deputies believed Wood to be truthful (Garrison testimony; Pye testimony; Wood

5

testimony).  (See also Tyler interview regarding seeing Jordan remove the job box at MVS 11:34:15).

Cpl. Garrison asked Jordan whether he would allow them to confirm that Mr. Wood's property was not at his shop in Vivian.  Jordan gave evasive answers regarding that as well, including the following:

Q:    When will you be available for us to check your shop?

A:    This is his stuff.

Q:    But he's got stuff missing.

A:    Well I don't know what….  All I know is you see anybody could have got it.  He told me they were getting it.  I have no idea where it all is.

(MVS at 10:59:40). Jordan's statements were, again, intentionally evasive. He later indicated that they could do so Monday, but would not provide further information.  (MVS at 11:00:11).

Q:    For him to be okay, and say that you don't have any stuff in your shop, then that's what we want to look in for tomorrow. And that's okay with you?

A:    Well, I mean, I don't have nothing there.

Q:    But, to ease everybody's mind.

A:    I don't to have ease anybody's mind….

(MVS at 11:00:30).

Q:    So, he needs to get his stuff out of that camper trailer.

A:    I believe we better go – I better call a lawyer….

(MVS at 11:08:17).

6

Cpl. Garrison spoke to her supervisor on her cell phone to discuss the circumstances, and the supervisor confirmed that an arrest was appropriate for theft. (Garrison testimony; see Garrison on cell phone, MVS at 11:10:40). There is no evidence in th record of any attempt by Jordan to call or notify any lawyer.

Cpl. Garrison requested again that Jordan allow Wood to remove his property from Jordan's shop in Vivian or he would be arrested, and in response Jordan stood and placed his hands behind his back to communicate that he should be arrested instead.

Garrison:     If you don't agree to take us right now to get his stuff, out of that camper, I am going to arrest you for theft.  Bottom line.

[Jordan turns and places hands for cuffing]

Garrison:     All right.  Put the handcuffs on him.

(MVS at 11:13:08).

Based upon the factual information obtained from Jordan's clearly suspicious evasive and contradictory statements, Cpl. Garrison and Deputy Pye believed that there was probable cause that Jordan had committed a theft of Wood's property in violation of La. R.S. 14:67.  (Testimony of Garrison and Pye).

Based upon the information developed by the deputies, under the related offense doctrine, there was also probable cause to believe that Wood had committed the offense of unauthorized use of a movable (the camper containing Wood's personal property) in violation of La. R.S. 14:68.

With respect to the claim that Cpl. Garrison should not have entered Jordan's home, or should not have permitted Wood to do so, Jordan clearly stated multiple times that Wood could remove all of his property, and placed no restrictions on where that property could

7

be retrieved.  As confirmed by MVS, Jordan did not ever say that the deputies or Wood could not go to any specific location.  (Testimony of Garrison and Pye).  A reasonable officer under these circumstances would not have believed that Jordan had somehow limited his consent.  (Id.).

Multiple statements by Jordan caused the deputies to believe that Jordan had consented to permit Wood to retrieve all of his belongings wherever they were located on his property, whether inside of the residence, under the residence, on the porch of the residence:

A:    He can look here and see what's here of his.

(MVS at 10:54:41).

Q:    Does he have anything inside the house of his?

A:    No sir, that I know of.

(MVS at 10:57:58) (he did not state, for example, "that's off limits," or "he can't get his belongings from inside the house").

A:    But, when he leaves here.  I don't want him on my property again. Now, he needs to get what's his and that's it.

(MVS at 11:00:12) (emphasis added).

A:    I don't think he will take nothing that's not his.

(MVS at 11:05:30).

A:    I want him to get what he thinks is his now and that's it.  And he has no right to come back on this place.

(MVS at 11:05:51) (emphasis added).

"[To Woods] You ain't going get nothing but what's your stuff, right?

(MVS at 11:06:30).

It therefore appeared to Cpl. Garrison and Deputy Pye that Jordan clearly consented for Wood to obtain and remove whatever property was his from wherever it was located while the deputies were present, whether inside or not, and that he did not want Wood back on his property after that:

Q:     He has the right to get his stuff.

A:     He don't have any right to come back on this place.

Q:     Yes he does.  While we're here he does.

A:     Well, y'all do what you need to do.

(MVS at 11:00:57). Cpl. Garrison understood from this and the other exchanges that Mr. Jordan wanted Wood to obtain all of his property while the deputies were present, without limitation to where it was located in the residence or on the property.

Even after plaintiff was arrested, he did not ever indicate to Cpl. Garrison that his consent had changed. Accordingly, Cpl. Garrison continued to reasonably believe that Jordan had given consent for Wood to obtain his property wherever it was located. (Garrison testimony).

Wood told Garrison that a deer head on the wall inside Jordan's home and that other property inside was his. Cpl. Garrison stood in the entry area of the living room while Wood removed the deer head, shop vac, and a five foot level.  (Garrison testimony; Wood testimony). Each item was removed and placed in the pick-up truck in full view of the dash camera and in full view of Jordan who had been placed in the back seat of the patrol car.

Deputy Pye had not been with Garrison while Wood described the deer head, so Deputy Pye understood that the only property of Wood in the home was the computer and that this would be addressed later because Jordan had personal information on Wood's

9

computer.  (Pye testimony).

While Deputy Pye was placing the seatbelt on Jordan, Jordan said: "They better not let <u>him</u> go in that house now, <u>he has nothing in that house</u>." (MVS at 11:20:50, emphasis added; note that MVS camera angle 2 confirms Deputy Pye placing plaintiff in the seatbelt in the back seat at the time of this comment).

Deputy Pye was not aware of where Garrison and Wood were while Pye was dealing with Jordan in the patrol car.  There is an area under the residence that was not visible to Deputy Pye, a porch on the back of the residence as well as other areas.  (Testimony of Deputy Pye; MVS beginning at 11:20:50).

Apparently Deputy Pye did not think that Wood had property in the residence so he did not think that Cpl. Garrison and Wood had entered the residence.  (Pye testimony).

There is no statement to Cpl. Garrison by Jordan limiting consent for Wood to obtain his property wherever located and there was no communication to Cpl. Garrison by anyone that Jordan had withdrawn his general consent for removal of Wood's property wherever located or added a restriction.  (Garrison testimony).  This is confirmed by review of the entirety of the MVS as well.

Based on the totality of the circumstances, Cpl. Garrison and Deputy Pye were reasonable in believing that Jordan had given consent to permit Wood to obtain his property wherever it was located on Jordan's Oil City property.  (Garrison testimony; Pye testimony).

Throughout the lengthy MVS recording, Wood can be seen moving property from the house to his truck in full view of the dash camera, Jordan never objected as these items were individually placed in the bed of a pick-up truck.  All of the property retrieved by Wood

after Jordan is placed in a patrol car, i.e. the deer head, shop vac, and carpenter's level, was carried by Wood to a truck parked adjacent to the patrol car in full view of Jordan. Jordan made no complaint that these items actually belonged to him or that Wood was stealing Jordan's personal property.  (MVS recording from 11:18:00 forward).

Cpl. Garrison and Wood were in the residence only briefly.  They entered the residence through a glass door on a small porch located on the back of the residence. They are seen at the top of the stairs entering the porch located at MVS 11:20:50, and Wood can be seen leaving the porch and entering the stairway again with the deer head at 11:22:29, with Cpl. Garrison shortly thereafter.  Accordingly, Wood and Garrison are out of the camera's sight one minute and 39 seconds, during which time they moved across the porch, into the residence, where Wood removed the deer head as Garrison watched, then they left the porch and reached the top of the stairs again.  (Id.).

Cpl. Garrison did not see Wood enter any other area of the residence during that brief period, and does not believe that Wood could have done so without her noticing. (Garrison testimony).

Cpl. Garrison later retired from the Caddo Parish Sheriff's Office and moved to Hammond, Louisiana.  She was not notified of the criminal trial involving Jordan and the criminal charges arising from his conduct, and therefore, did not testify.  (Garrison testimony).

**Conclusions of Law**:

<u>Findings of Credibility of Witnesses</u>

The standard giving discretion to the Court in a bench trial to determine the credibility of the witnesses is well settled:

11

When a judgment after a bench trial is on appeal, we review the findings of fact for clear error and the legal issues de novo. See Gebreyesus v. F.C. Schaffer & Assocs., Inc., 204 F.3d 639, 642 (5th Cir.2000) (quoting FDIC v. McFarland, 33 F.3d 532, 536 (5th Cir.1994)). Under the clearly erroneous standard, we will reverse only if we have a definite and firm conviction that a mistake has been committed. See Mid–Continent Cas. Co. v. Chevron Pipe Line Co., 205 F.3d 222, 229 (5th Cir.2000). "The burden of showing that the findings of the district court are clearly erroneous is heavier if the credibility of witnesses is a factor in the trial court's decision." Dunbar Medical Systems Inc. v. Gammex Inc., 216 F.3d 441, 453 (5th Cir.2000) (quotation marks omitted). That's because "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a); Torch, Inc. v. Alesich, 148 F.3d 424, 426 (5th Cir.1998) ("The factual findings of the trial court in a bench trial may not be set aside unless clearly erroneous and due regard must be given to its credibility evaluations."); Ruiz v. Estelle, 679 F.2d 1115, 1131, amended in part & vacated in part, 688 F.2d 266 (5th Cir.1982) ("[I]n a bench trial the assessment of witness credibility is inherently his province."). We cannot second guess the district court's decision to believe one witness' testimony over another's or to discount a witness' testimony. See Brister v. Faulkner, 214 F.3d 675, 684 (5th Cir.2000).
Canal Barge Co., Inc. V. Torco Oil Co., 220 F.3d 370, 375 (5th Cir. 2000).

The Court could not grant Defendants' Motion for Summary Judgment regarding the defense of qualified immunity in this matter only because the credibility of the witnesses' statement could not be evaluated in such a motion. However, as a result of the trial, the Court found zero credibility in the word of the Plaintiff. Specifically, the Plaintiff steadfastly failed to present his business records or tax returns related to his claimed loss of economic opportunity and other damages. These records were the subject of a discovery request, but Plaintiff never produced his business records. These "records" exist but he did not produce them at trial. Instead, Jordan "estimated" his losses at around $200,000. This provides the trier of fact with an adverse presumption against the Plaintiff.  International Union, United Auto., Aerospace and Agr. Implement Workers of America (UAW) v. N.L.R.B., 459 F.2d 1329, 1336 (D.C. Cir. 1972). His estimated damages could have been proved with a fair measure of mathematical certainty had he produced those records. The fact is Jordan hid

12

them from scrutiny during discovery and did not produce them at trial. His uncorroborated estimates are without merit.

The totality of the testimony presented made it obvious to the Court that the Plaintiff intentionally moved personal property of Wood to a location owned by a third party in order to secret that property from Wood and make it very difficult, if not impossible, to retrieve. Jordan lied to the deputies at the outset. Jordan's devious plan was to seize Wood's property and keep it for himself or to use it as leverage against Wood. Further, the Plaintiff failed to provide any proof regarding the claim that Wood took $900 in cash from the house. The Court specifically notes the fact that other individuals had access to the inside of the house, including the crew installing new flooring in the house at the time. No cash transaction receipt was provided by plaintiff. His bald assertion that he had $900 in cash in a pocket of his jeans inside the residence is insufficient to carry his burden of proof on this issue, especially considering the Plaintiff's lack of credibility.

General Qualified Immunity Principles

A court ruling upon the issue of qualified immunity must apply a two-step analysis. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  The court must determine whether "the facts alleged show the officer's conduct violated a constitutional right."  Id.  Second, if a violation has been established, the court must additionally determine whether the officer's actions were objectively reasonable in light of clearly established law at the time of the conduct in question.  Id.

Once a defendant has raised a qualified immunity defense, the plaintiff bears the burden of demonstrating the violation of a clearly established right.  To demonstrate that

13

a right is "clearly established," although plaintiffs need not show that the "very action in question" was previously held unlawful, the right must be sufficiently clear so that a reasonable officer would understand that he is violating that right.  Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039 (1987).

The Supreme Court has stated that a court may assess the two part standard for qualified immunity in any order.  Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808 (2009).

Qualified Immunity for Probable Cause Determination

"On many occasions, we have reiterated that the probable-cause standard is a "'practical, nontechnical conception'" that deals with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Maryland v. Pringle, 540 U.S. 366, 370-71, 124 S.Ct. 795, 799-800 (2003) (quoting Illinois v. Gates, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting Brinegar v. United States, 388 U.S. 160, 175-176, 69 S.Ct. 1302); see, e.g., Ornelas 800 v. United States, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); United States v. Sokolow, 490 U.S. 1, 7-8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." Maryland v. Pringle, 540 U.S. 366, 370-71, 124 S.Ct. 795, 800 (2003) (quoting Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317).

"The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances."  Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 800 (2003).

14

"Probable cause exists when the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed."  Evett v. DETNTFF, 330 F.3d 681, 688 (5th Cir. 2003) (quoting Bigford v. Taylor, 824 F.2d 1213, 1218 (5th Cir. 1988).

"[P]robable cause standards for reasonableness differ from those for qualified immunity."  Evett v. DETNTFF, 330 F.3d 681, 688 (quoting Wren v. Towe, 130 F.3d 1154, 1160 (5th 1997) (internal quotation marks omitted)).   "An officer may be shielded from liability even if he reasonably but mistakenly conclude[s] that probable cause is present." Evett v. DETNTFF, 330 F.3d 681, 688 (quoting Mangieri, 29 F.3d at 1017 (internal quotation marks and citation omitted)).

Corporal Garrison had received reasonably trustworthy information that Jordan had removed items belonging to Richard Wood, without Richard Wood's consent, and moved them to a location in Vivian, LA owned by a third party.  Corporal Garrison relied upon the admissions of Jordan that a camper trailer in fact contained Wood's personal property. Corporal Garrison also relied upon the statements of the victim, Richard Wood, that some of his personal property had disappeared from Jordan's residence, which was corroborated through investigation at the scene.  Corporal Garrison also relied upon the statement of Wood that a neighbor had observed  Jordan drive away from the residence pulling the subject camper trailer and Wood's job box in the back of the truck.  This last information was corroborated by and consistent with Jordan's own admission that he had moved the camper trailer.  Therefore, Corporal Garrison had reasonably trustworthy information to believe that Jordan had taken property belonging to Wood.

15

Corporal Garrison also had reasonably trustworthy information to believe Jordan took Wood's property with the intent to permanently deprive Wood of his property. Corporal Garrison and Deputy Pye had asked Jordan several times to take them and Wood to Vivian, so Wood could retrieve his property there.  At the scene, Jordan refused these offers to return Wood's property to him.  Corporal Garrison also relied upon the evidence gathered which confirmed that Jordan had been evasive and untruthful (i.e., Jordan lied) on a number of occasions about still having possession of Wood's personal property at his house or at another location.  These purposeful and misleading evasions, along with Jordan's repeated refusal to allow Wood to retrieve his property gave Corporal Garrison reasonably trustworthy information that Jordan intended to permanently deprive Wood of his property.

Corporal Garrison therefore, had probable cause to arrest Jordan for theft, in violation of La. R.S. 14:67.

The related offense doctrine provides qualified immunity if the officer "could have arrested the plaintiff for another offense" if two conditions are satisfied.  First, the charged and uncharged offenses must be 'related.'  Second, the arresting officer must demonstrate that there was arguable probable cause to arrest the plaintiff for the uncharged related offense."  Vance v. Nunnery, 137 F.3d 270, 274 (5th Cir. 1998).  In addition to having probable cause to arrest Jordan for theft, there was probable cause to arrest Jordan for unauthorized use of a movable, in violation of La. R.S. 14:68, under the related offense doctrine.  Corporal Garrison had reasonably trustworthy information that Jordan had intentionally moved the property of Wood without Wood's consent.  Corporal Garrison had

16

reasonably trustworthy information that the value of the property was greater than $500.00, thereby making the offense a felony.

Qualified Immunity for Scope of Consent

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151 (2001).  At its core, the question is one of fair notice:  "If the law did not put the officer on notice that his conduct would be clearly unlawful,…qualified immunity is appropriate."  Id., 533 U.S. at 202.

A key determination in this analysis is the level of generality for courts to apply in identifying which legal rights are clearly established, and the Supreme Court has cautioned against imposing an unrealistic burden on public officials in conducting this analysis. Anderson, 483 U.S. at 639, 107 S.Ct. at 3038-39.  An accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued.  Malley v. Briggs, 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 1097, 1096 (1986).

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  Anderson v. Creighton, 483 U.S. 635, 639, 109 S.Ct. 3034 (1987).

For a law to be "clearly established," there must be Supreme Court or Fifth Circuit authority or the consensus of authority among other circuits must establish the contours of the right with sufficient clarity to provide fair warning that the conduct would violate the right.  McLendon v. City of Columbia, 305 F.3d 314, 329-333 (5th Cir. 2002) (holding that

17

inconsistencies and uncertainties within the alleged consensus did not provide fair warning to officers).

"To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.' " Reichle v. Howards, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (quoting Ashcroft v. Al-Kidd, 131 S.Ct. 2074, 2078, 179 L.Ed.2d 1149 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (internal quotations omitted).

A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508 (2002).  However, " 'existing precedent must have placed the statutory or constitutional question beyond debate.' " Reichle v. Howards, 132 S.Ct. 2088, 2093, 182 L.Ed. 2d 985 (2012) (quoting Ashcroft v. Al-Kidd, 131 S.Ct. at 2083).

Because of the various factual scenarios possible in scope of consent settings, the right at issue must be defined specifically if the officer is to be provided notice that the proposed conduct is unlawful.  For example, in Winnfield v. Trottier, 1710 F.3d 49 (2d Cir. 2013), the officer requested to search plaintiff's vehicle during a traffic stop, stating "there's nothing in there I should know about is there?  No guns or money?" and plaintiff responded "you can look."  The officer located an envelope, then opened the envelope and read the correspondence contained in the envelope.  The court found that the consent was not limited by its expressed object, guns or money, because the question did not convey any "expressed object" of the search:  "There's nothing in there I should know about is there?  No guns or money?"  Id. at 55.  The court focused upon the fact that the open ended

question reached "anything" he should "know about," of which guns and money were examples.  Accordingly, the court found that a typical person would not think that consent was limited to places that could hold guns or money.  However, the court found that no reasonable person would believe that the consent authorized the officer to read personal mail.  Nevertheless, qualified immunity was necessary where the right at issue was properly stated with precision, not generally, as follows:

> It is a Fourth Amendment violation when a police officer reads a suspect's private papers, the text of which is not in plain view, while conducting a search authorized solely by the suspect's generalized consent to search the area in which the papers are found.  No prior case in the Second Circuit has so held.  Accordingly, Trottier's actions were objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

Id. at 57.

The relevant legal rule which must be "clearly established" is identified with reference to the particularized facts and circumstances of the case."  Cantu v. Rocha, 77 F.3d 795, 807 (5th Cir. 1996) (summarizing Anderson v. Creighton, 483 U.S. at 639).

Unless all reasonable officers in the defendant's circumstance would have known that the conduct in question violated the constitution, the defendant is entitled to qualified immunity.  Thompson v. Upshur City, Tex., 245 F.3d 447, 457 (5th Cir. 2001) (emphasis in original).

A consensual seizure of property without a warrant does not violate the Fourth Amendment.  U.S. v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988 (1974).  It is plainly clear that the Fourth Amendment's general prohibition against warrantless search and seizure did not apply when the "search [is] conducted pursuant to a valid consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045 (1973).

19

The Supreme Court has also addressed situations involving the permissible scope of searches.  In <u>United States v. Ross</u>, 456 U.S. 798, 102 S.Ct. 2157 (1982), for example, the court held that a "lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."  <u>Id.</u> at 820-21, 102 S.Ct. at 2170-71.

The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness, what would the typical reasonable person have understood by the exchange between the officer and the suspect.  <u>Florida v. Jimeno</u>, 500 U.S. 248, 251, 111 S.Ct. 1801 (1991).

"The scope of the search is generally defined by its expressed object."  <u>Jimeno</u>, 500 U.S. at 251, 111 S.Ct. 1801 (no Fourth Amendment violation where defendant consented to search of his car and the police found cocaine in a closed paper bag found on the floor of the car).

A suspect may of course delimit as he chooses the scope of the search to which he consents.  <u>Jimeno</u>, 500 U.S. at 252, 111 S.Ct. 1801.  To determine the parameters of consent, the Court must ask "what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  <u>Id.</u> at 251, 111 S.Ct. 1801.

Courts must consider the totality of the circumstances when determining whether there are any limitations placed on the consent given and whether the search confirmed to those limitations.  "When an individual gives a general statement of consent without express limitations, the scope of a permissible search is … constrained by the bounds of

20

reasonableness."  U.S. v. Ibarra, 965 F.2d 1354, 1358 (5th Cir. 1992) (quoting U.S. v. Strickland, 902 F.2d 937, 941-42 (11th Cir. 1990)) (internal quotations omitted).

For example, the statement to an officer regarding a tractor that, "if its stolen, go ahead and take it then," was reasonably interpreted as not only applying to the day of the statement; accordingly, officers could return two months later and seize the tractor.  Tucker v. Williams, 682 F.3d 654, 659 (7th Cir. 2012).

Jordan's statement made only to Deputy Pye while in the patrol car, "They'd better not let him go in my house, now.  He has nothing in that house," was not an unequivocal limitation of consent.  Jordan's statement was premised on whether Mr. Wood had property in the house. It was, therefore, not an unequivocal revocation of consent.  See, e.g., U.S. v. Alfaro, 935 F.2d 64, 67 (5th Cir. 1991) (when told to get against the wall to be searched, response "I have to go outside and talk to lieutenant" did not call into question the subsequent search, as it "falls far short of an unequivocal act or statement of withdrawal.") (citing cases from other circuits where person either said "No" or "stop" ) (quoted in U.S. v. Herrera, 2006 WL1751082, p. 16 (W.D. La. 2006) ("a reasonable person in Defendant's situation would have … said unequivocally that he wanted the search to stop.").

Plaintiff does not contend that his consent was not voluntary, but even had such a claim been made, voluntariness is an issue particularly subject to qualified immunity.  See, e.g., Hudson v. Hall, 231 F.3d 1298, 1297 (11th Cir. 2000) (even assuming that statement "if you don't want to be searched, start walking," was coercive and rendered consent involuntary, qualified immunity was necessary because the impropriety of the officer's statement was not obvious and no materially similar case provided the officer with notice that such consent was involuntary).

21

Under Louisiana law, the same standards are used in analyzing state law claims namely, whether the officers actions were "reasonable" under the circumstances. See Colston v. Barnhart, 130 F.3d 96, 99 (5th Cir.1997); Reneau v. City of New Orleans, 2004 WL 1497711, *3-4 (E.D.La. July 2, 2004); Kyle v. City of New Orleans, 353 So.2d 969, 973 (La.1977). Here, both deputies, Pye and Garrison are entitled to qualified immunity.[1]

## CONCLUSION

For the forementioned reasons, this Court finds that the defendants had probable cause for arresting Rickey Jordan and are therefore entitled to qualified immunity on that issue. Additionally, the defendants are entitled to qualified immunity for the search of the Jordan's home because Jordan provided consent for Wood to "get his stuff." Even if Jordan intended to limit the search to the area under his home, a reasonable officer could have mistaken the consent to include allowing Wood to retrieve his items from the interior of the home. Further, the lack of credibility by Wood prevents him from carrying his burden.

**THUS DONE AND SIGNED** this 8th day of April, 2014 in Chambers in Shreveport, Louisiana.

_S. Maurice Hicks_

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE

---

[1] With this Court having found that the Plaintiff provided general consent to search his property and the finding of qualified immunity, the issues of damages need not be addressed.